# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Remanded on October 31, 2016

## STATE OF TENNESSEE v. ANGELA AYERS

**Appeal from the Criminal Court for Shelby County**
**No. 12-03161     J. Robert Carter, Jr., Judge**

---

**No.  W2014-00781-CCA-R3-CD – Filed December 13, 2016**

---

The Tennessee Supreme Court has remanded this case for reconsideration in light of *State v. Willie Duncan*, --- S.W.3d. ---, No. W2013-02554-SC-R11-CD, 2016 WL 6024007 (Tenn. Oct. 14, 2016). *See State v. Angela Ayers*, No. W2014-00781-CCA-R3-CD, 2015 WL 4366633 (Tenn. Crim. App. July 16, 2015) ("*Ayers I*"), *perm. app. filed, case remanded* (Tenn. Oct. 31, 2016).  Relevant to the current remand, this court concluded in the previous appeal that the State's failures to identify the underlying dangerous felony in the indictment count related to employing a firearm during the commission of a dangerous felony and to charge a separate offense that was an enumerated dangerous felony rendered the indictment count relative to the employing a firearm during the commission of a dangerous felony defective.  Upon further review, we conclude that in lieu of identifying the enumerated dangerous felony in the indictment count charging employing a firearm during the commission of a dangerous felony, the indictment must charge separately at least one enumerated dangerous felony in order to provide a defendant with adequate notice of the charged offense.  Under the circumstances in this case, we conclude that the count charging employing a firearm during the commission of a dangerous felony is defective because it failed to provide the Defendant adequate notice of the charged offense.  We affirm the judgments of the trial court relative to the voluntary manslaughter and false report convictions, but we reverse the employing a firearm during the commission of a dangerous felony judgment, vacate the conviction, and dismiss the charge.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Vacated and Dismissed in Part; Case Remanded

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

M. Haden Lawyer (on appeal and at trial) and Andrew Plunk (at trial), Memphis, Tennessee, for the appellant, Angela Ayers.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Patience Branham and Kenya Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case involves convictions for manslaughter, false report, and employing a firearm during the commission of a dangerous felony. The offenses arose from a domestic disturbance, which resulted in Tario Graham's sustaining a single gunshot wound to the head. The trial evidence showed:

Angelica Mitchell, the victim's sister, testified that the Defendant was the mother of the victim's younger son, who was five years old at the time of the trial. She said the Defendant and the victim's relationship spanned about ten years. She never saw the Defendant and the victim argue and thought they had a good relationship. She said the victim was tall, slim, and had stomach problems, although she did not know any details.

Earl Jones, the victim's cousin, testified that on February 23, 2012, he picked up the victim at home early that morning. The men went to the lumberyard to buy materials for the victim's house. The men returned to the victim's house around 10:00 a.m., and Mr. Jones said the Defendant, her and the victim's son, and her sister were there. The Defendant and the victim began arguing. Mr. Jones walked outside, and the Defendant's sister left. Mr. Jones said the argument was about women. He heard the Defendant say she wanted the victim out of the house and the victim say that he did not want to argue. Mr. Jones sat on the hood of a car parked in the driveway and waited for the victim. The argument lasted about three minutes, and Mr. Jones saw the victim leave the house and run toward the back of the house. The victim returned to the front of the house about fifteen to twenty minutes later.

Mr. Jones testified that after the victim ran toward the back of the house, he heard a gunshot from inside the house. He told the victim that the Defendant had fired a gun, and the victim told Mr. Jones that the Defendant was not going to do anything. The victim began walking down the sidewalk toward a convenience store and told Mr. Jones to join him. Mr. Jones said the victim was walking in front of him when the Defendant came out of the house, walked behind them, yelled, cursed the victim, and accused the victim of knocking out her tooth. Mr. Jones said the Defendant yelled, "You, B----, you knocked my teeth out of my mouth," "You want to fight now," "Why you

-2-

running now," and "Come on back and fight." Mr. Jones saw the Defendant holding a gun. The Defendant told Mr. Jones to move, and the Defendant attempted to fire the gun, but it misfired. Mr. Jones said the Defendant fired the gun again, and the victim fell to the ground. Although he did not know where the victim had been shot, he assumed the Defendant shot the victim in the back of the head because the victim had not been facing the Defendant.

Mr. Jones testified that when the victim fell, the Defendant ran to the victim, talked about what she had done, returned home, changed her clothes, and returned to the scene. While the Defendant was gone, someone driving a truck stopped next to the victim, who was lying in the street, to prevent drivers from running over him. The Defendant talked to the first responders at the scene, and Mr. Jones heard the Defendant tell them that the victim had been hit by a car. The Defendant did not have the gun at that time.

Mr. Jones identified the clothing the Defendant wore at the time of the shooting and testified that the Defendant did not have any visible blood on her clothes before the shooting. Mr. Jones did not see the victim hit the Defendant. He said the victim was short, weighed about 120 pounds, and suffered from stomach ulcers. Mr. Jones said the victim did not have a gun that day and denied ever seeing the victim carry a gun. He said that the day of the shooting was the first time he had seen the Defendant carry a gun.

On cross-examination, Mr. Jones testified that although he left the house when the victim and the Defendant began to argue, he heard the argument from outside the house. He heard what he thought was a physical altercation, but he denied hearing them argue about anything other than the victim's cheating. He heard tussling and wrestling from inside the house. He said the Defendant did not have any injuries when he and the victim returned from the lumberyard. He said that the Defendant "was talking crazy" and screaming when she left the house with the gun. On redirect examination, he clarified that he looked at the Defendant when he saw the gun, that he saw the Defendant pull the trigger twice, and that after the gun fired, he looked at the victim, who fell.

Terrell Randle testified that on February 23, 2012, he lived across the street from the Defendant and the victim. He knew the victim but was never introduced to the Defendant. He said that before the shooting, he was working on his car. He said he saw Mr. Jones and the victim walking down the street, and the Defendant was following them. He heard the Defendant yell, "M.F.

it's your last time hitting me. You ain't going to do it no more[.]" He said the victim and Mr. Jones did nothing in response to the Defendant's yelling and continued walking down the street. He said the Defendant was a couple feet behind them, and she did not appear to have any injuries.

Mr. Randle testified that the Defendant had a small object in her hand when she left the house. He said that the victim and Mr. Jones walked out of his sight and that he heard a gunshot. Mr. Randle walked to the victim's location, and he said the Defendant ran past him and toward her house. He noticed the Defendant wore sweat pants and a shirt. When Mr. Randle arrived at the victim's location, he saw the victim lying in the street and said the victim did not respond when he called out the victim's name. He said the Defendant returned, was frantic and shocked, and said someone hit the victim with a car. He noticed the Defendant had changed her clothes and was wearing camouflage shorts. The Defendant did not have a gun when she returned, but he noticed the Defendant had "a bloodstain on her lip."

On cross-examination, Mr. Randle testified that he did not know what occurred after the victim and Mr. Jones walked out of his sight but before he heard the gunshot. He and the Defendant did not speak. He said that when the Defendant returned to where the victim was lying in the street, she seemed disturbed and emotional.

Edwin Boswell testified that on the day of the shooting, he was at "the candy lady's house" located across the street from the Defendant and the victim's house. Mr. Boswell and the victim were good friends, and he met the Defendant through the victim. He did not witness the shooting. On cross-examination, Mr. Boswell testified that he had spent considerable time at the Defendant and the victim's house and that he never saw them fight. He did not recall providing a statement to the police or telling the police he saw the Defendant and the victim running down the street.

Darren Turner testified that he was working outside at the time of the shooting. He saw the victim walk down the street and the Defendant walk behind the victim. He heard a gunshot and ran to the victim's location. He said the Defendant told him to call the police and ran to her house. The Defendant returned to the scene, and Mr. Turner said she had a "receiver" in her hand and said, "Come on, Tario. I'm sorry. I'm sorry, Baby." He said that when he first saw the Defendant, she was wearing camouflage shorts but was wearing jogging pants when she returned. On cross-examination, Mr. Turner

testified that the Defendant was upset and yelling when she returned to the scene.

Josea Franklin, Sr., testified that on the day of the shooting, he was across the street from the Defendant and the victim's house visiting his cousin, Sherry Talbert. He arrived at Ms. Talbert's house between 11:00 a.m. and 12:00 p.m. and said he saw the victim and another man walking down the street about five minutes later. Mr. Franklin saw a woman, whom he did not know, follow the men. He said the woman yelled and cursed that "she was tired of B.S. and that's the last time you put your hands on me." He said the victim and the other man continued walking down the street as the woman yelled. He recalled the men did not turn and look at the woman. He did not witness the shooting, but he saw the woman run toward and enter the victim's house and return to the scene. He said that when the woman returned to the scene, she had changed clothes and that she said the victim was hit by a car and asked those present which car hit the victim. He recalled the woman wore jogging pants before the shooting and shorts afterward. He was unable to identify the woman because he had never seen her at close range before that day.

On cross-examination, Mr. Franklin testified that the woman was upset and agitated when he saw her following the men down the street. He recalled the woman said, "I'm tired of you hitting me. This is the last time hitting me." He did not witness the shooting or hear the gunshot. He saw people running down the street and followed them.

Memphis Police Communications Supervisor Pamela Rowlett identified two recorded 9-1-1 calls that the police received relative to the shooting. In the first recording, a woman requested the police and an ambulance respond to the scene. The caller reported that a woman had shot a man, who was lying in the street. The woman said the shooter was African-American, was wearing black pants and a yellow shirt, and ran into a house nearby. In the second recording, a male caller reported that someone had been shot and that the victim looked deceased. The caller did not witness the shooting.

Memphis Fireman and Paramedic Steve Pecaitis, Jr., testified that he responded to the scene of the shooting after being flagged down by a passerby. He and his partner were only told that the victim was lying in the street. He initially thought the victim had been hit by a car because no obvious signs of injury were visible. After the victim was placed inside the ambulance, Mr.

Pecaitis found a large laceration on the forehead. Upon cleaning the wound, he found signs of possible entrance and exit gunshot wounds to the right and left brow areas, which were connected by the laceration. The victim was breathing at that time but was non-responsive. Mr. Pecaitis saw a skull fragment and brain matter and slightly compressed the wound to control the bleeding. The victim's condition worsened en route to the hospital, and he stopped breathing before arriving at the hospital. Mr. Pecaitis said, though, the victim was alive when they arrived.

Memphis Police Officer Shane Evans testified that he responded to the shots-fired call and that he was told the responsible person was at a house nearby. When he arrived, the Defendant ran down the street and screamed, "He got hit by a car. He got hit by a car." He said the Defendant looked frantic but was not crying or upset. He recalled the Defendant wore a yellow shirt. Officer Evans drove his police car to the scene of the shooting and found the paramedics treating the victim.

Officer Evans testified that he spoke to several witnesses at the scene who provided statements that were inconsistent with the victim's being hit by a car. Officer Evans said he spoke to the Defendant again and asked her what occurred. He noted the Defendant's calm demeanor and said she admitted shooting the victim. The Defendant told the officer that her younger son and the gun she used to shoot the victim were inside her house. The Defendant told the officer that she and the victim argued and that the victim hit her. Although Officer Evans did not notice initially any injuries to the Defendant, he saw facial swelling where the Defendant said the victim struck her.

On cross-examination, Officer Evans testified that he told the paramedics that the victim had been hit by a car based on the Defendant's statement. On redirect examination, he said that the Defendant's statement caused confusion. He said that when he arrived at the victim's location, a car was parked a few feet away and that he thought a pedestrian might have been struck by the car. He said shootings were less common than a car striking a pedestrian.

Memphis Police Officer Sondra Wicks testified that she responded to the scene to assist other officers. Although Officer Wicks did not speak to the Defendant, she saw the Defendant from a distance. She recalled the Defendant wore extremely short shorts and a small t-shirt. While standing outside the Defendant and the victim's house, she saw a young boy crying and standing

just inside the front door. When she learned the boy was inside the house alone, she unsuccessfully attempted to enter. Officer Wicks said the Defendant's mother came to the house and was able to instruct the boy how to unlock the door. Officer Wicks did not allow the boy and grandmother to enter the house, but she entered to obtain a coat for the boy and pants for the Defendant because it was cold that day. When Officer Wicks learned the Defendant had been wearing the pants earlier that day, she returned the pants to the living room where she found them. She said that when she grabbed the pants from the sofa, a pair of red underwear fell from them. Officer Wicks did not touch the underwear.

Memphis Police Officer Brandon Westrich testified that he detained the Defendant after he arrived at the scene. He identified the Defendant's cell phone and blue hooded sweatshirt. He transported the Defendant to the police station and said she appeared calm and quiet and did not speak to him.

On cross-examination, Officer Westrich testified that the Defendant was inside a police cruiser when he arrived at the scene. He identified photographs of the Defendant's forehead, elbow, left side of her body, mouth, and clothes she wore at the time of her arrest. The photographs showed a cut to her forehead, a possible injury to her elbow, dried blood on her mouth, and swollen lips.

Memphis Crime Scene Officer Tristan Brown testified that he processed the scene, the victim, and the victim and the Defendant's house. He found an empty gun holster in a bedroom and a .22-caliber Smith & Wesson revolver inside a toilet tank in a bathroom. He identified an envelope containing six live .22-caliber rounds and one fired .22-caliber cartridge casing found inside the house. He identified red underwear, white tennis shoes, and a black telephone recovered from the victim and the Defendant's house.

On cross-examination, Officer Brown clarified that the tennis shoes were recovered from a driveway next door to the Defendant and the victim's house. He did not know who owned the shoes but said a police officer at the scene thought the shoes might have belonged to the Defendant and might have had blood on them. Relative to the firearm found in the toilet tank, he said that the toilet tank lid was broken before he arrived and that the revolver was in plain view.

Dr. Miguel Laboy, Shelby County Assistant Medical Examiner and expert in forensic pathology, testified that Dr. Caruso performed the victim's autopsy before Dr. Caruso was hired as the Chief Medical Examiner in Denver, Colorado. Dr. Laboy reviewed the autopsy and toxicology reports and photographs taken during Dr. Caruso's autopsy of the victim, which were received as exhibits. After reviewing the reports and photographs, Dr. Laboy concluded that the cause of death was a gunshot wound to the head. He agreed with Dr. Caruso's conclusion that the manner of death was homicide.

Dr. Laboy identified photographs of the entry wound and testified that the bullet entered above the right eye and traveled slightly from right to left. He said that the bullet perforated the brain and that the orbital bones around the eyes and the base of the skull were fractured. He noted the bullet was recovered from the left rear side of the head. He said the autopsy report noted that the victim had a laceration on the side of the eye and abrasions on the right arm, left elbow, and left leg. The victim's toxicology analysis showed the presence of marijuana and isopropyl alcohol.

On cross-examination, Dr. Laboy testified that he could not perform an autopsy without examining a body and that he was not present during the victim's autopsy. He became involved in this case days before the trial and said he reviewed Dr. Caruso's file the morning of his testimony. He said that before the victim arrived at the medical examiner's office, his heart, lungs, kidneys, liver, adrenal glands, pancreas, and a portion of his small intestines were removed for organ donation. He did not believe that an evaluation of those organs would have indicated a different cause of death because the organs had to be viable to be transplanted. He agreed, though, he did not review any documentation relative to the organs' conditions at the time of harvest.

Dr. Laboy testified that no exit wound was documented in the autopsy report or in the photographs. He concluded that the victim was not shot in the back of the head. He said that the report showed no soot or stippling, but he was not comfortable giving an opinion about the distance between the victim and the gun at the time of the shooting. He said the alcohol present in the victim's blood was consistent with his receiving medical treatment.

On redirect examination, Dr. Laboy testified that regardless of the condition of the organs harvested for transplant, the cause of death was the gunshot wound to the head. He said that it was unlikely someone would have

survived such an injury and that if someone had survived, he or she would have been in a vegetative state.

Tennessee Bureau of Investigation (TBI) Special Agent Cervinia Braswell, an expert in firearms identification, testified that she analyzed a .22-caliber Smith & Wesson revolver, two fired cartridge casings, six unfired live bullets, and the fired bullet recovered during the victim's autopsy. She test-fired the revolver to make comparisons. She concluded that the bullet recovered during the autopsy had been fired from the revolver. She also concluded that the fired cartridge casings submitted for analysis had the same class characteristics and some of the same individual characteristics and that the casings could have been fired from the revolver, although she could not make a conclusive determination.

Arianne Stewart testified for the defense that she and the Defendant were coworkers and that she had purchased narcotics from the victim. On February 23, 2012, Ms. Stewart arrived at the Defendant and the victim's house between 12:00 and 1:00 p.m. While Ms. Stewart was there, the Defendant and the victim argued about the garbage and something the Defendant found on the victim's cell phone. Ms. Stewart heard the Defendant ask the victim to take out the garbage before he left, and the victim refused. Ms. Stewart was in the kitchen when the argument began in the bedroom. She saw the victim leave the house and return immediately and said the victim began hitting the Defendant, called her "b----" and "w----," and called her older son "slow." Ms. Stewart said the physical altercation began in the living room near the kitchen area. She saw the victim pull the Defendant's hair, put the Defendant on the floor, and kick and hit the Defendant while she was on the floor. Ms. Stewart said the Defendant was bleeding and had a "busted" lip after the altercation. The Defendant and the victim's son was also present during the altercation.

Ms. Stewart testified that she did not intervene during the altercation because she feared the victim, who was possessive and controlling. She stayed in the kitchen during the incident and said the Defendant did not hit the victim. After the incident, the victim left the house, and the Defendant went to the bathroom to clean her face. Ms. Stewart waited a few minutes and left without speaking to the Defendant. She returned to the area after the shooting. She stated that the Defendant did not own a firearm.

On cross-examination, Ms. Stewart testified that she left the house around 1:00 p.m., after waiting five to ten minutes. She was worried but said the Defendant did not call the police. She said the Defendant and the victim's son was on the couch when the Defendant went to the bathroom. Ms. Stewart saw the victim and his cousin standing beside a car when she left.

The Defendant testified that on February 23, 2012, she awoke and took her older child to school. After she returned, the victim and her younger son awoke. The victim smoked marijuana and told the Defendant he was going to his grandparents' house to stay with his grandmother while his grandfather ran an errand. While the victim was gone, he called the Defendant and told her that his cousin was coming to the house to purchase heroin. Although the Defendant told the victim that she would handle it, the Defendant told the cousin that the victim took the drugs with him. The Defendant said she lied because she did not want to sell drugs. The Defendant said the victim was mad when he returned, obtained the drugs, and left again.

The Defendant testified that Ms. Stewart arrived around 12:00 p.m., that they talked for a while, and that Ms. Stewart entered the kitchen about the time the victim returned. The Defendant said that they were in the process of renovating their house and that the victim complained the work to the house would not be completed if he had to come home every time someone wanted to buy drugs. The Defendant said that the conversation became heated and that she told the victim too much activity occurred at their house. She said the victim became angry, and she mentioned the victim's refusing to take out the garbage. The victim told her to have her older son take out the trash. The Defendant said the victim called her son "stupid," which angered her. She said that "this [was] not the first time that [the victim had] done this . . . . He's hit my son before." The Defendant was hurt and embarrassed by the victim's comment about her son. She said, "F--- you," to the victim, who began hitting her. The Defendant said she saw the victim's rage, which she had seen throughout their relationship. She said the victim hit her in the mouth and head with his fist, knocking her to the floor. The victim kicked her after she fell. Afterward, the victim left the house, and the Defendant got up from the floor. The Defendant said that her head hurt and that she was humiliated and angry. She picked up the victim's gun from the bedroom and left the house.

The Defendant testified that after she left the house, she saw the victim and his cousin walking down the street. The Defendant said she was angry because she had endured the victim's abuse for about seven years and because

the victim had also abused her son. She said the victim did not allow her to have friends, did not allow her mother at their house, and disrespected her family. The Defendant said she was also hurt and humiliated because the victim had hit her and insulted her son on the day of the shooting, although the victim had said he would no longer do those things.

The Defendant testified that she did not know what she was going to do with the gun. Although she was angry and hurt, she said she loved the victim. She said she gave the victim everything and did whatever he asked. She said that three weeks before the shooting, they fought when she told the victim she wanted to leave. She said the victim told their son to go to his room because "your mama about to get her a-- beat tonight." The Defendant told the victim that she did not want to sell drugs for him anymore and wanted the victim to change. The victim told the Defendant, "I'm going to change . . . don't leave. When we get your taxes, we're going to fix up the house. It's going to work." The Defendant said she thought of all these things as she walked down the street behind the victim.

The Defendant testified that she yelled at the victim as she walked behind him. She asked him why he hit her yet again and in front of their child. She said she only wanted to know why he had hit her, although he had said he would not place his hands on her again. She followed the victim to the corner of the street and continued to yell at him. She said she usually did not disrespect the victim because she knew the consequences. She knew people were outside watching and said it must have angered the victim, who did not tolerate disrespect. She said "grown men" feared the victim. As the Defendant continued yelling, the victim stopped and turned. She said she pulled out the gun, closed her eyes, and fired the gun when she saw the victim coming toward her. She said she fired the gun because the victim was coming toward her, which scared her. She denied wanting to kill him and said she was not thinking clearly or about what would happen when she fired the gun.

The Defendant testified that she could not believe she had shot the victim and that she ran to him, called his name, and repeatedly said, "Baby, baby, what have I done[?] What have I done?" She said that although the victim was abusive, she loved him and would never have hurt him. The victim was the father of one of her children, and their relationship spanned many years. She said she put the victim's needs before anyone else's needs. She said that after she realized the victim had been shot in the head, she urinated on herself. After she yelled for someone to call for an ambulance, she ran home

-11-

and lost one of her shoes on the way. Once she arrived home, she called 9-1-1, reported that the victim had been hit by a car because a bystander said the victim had probably been hit by a car, changed her underwear and pants, and placed the gun in the toilet tank. She said she placed the gun in the toilet tank because she was scared and did not want the gun in her possession. She said she was frantic and in disbelief of the events.

The Defendant testified that she returned to the scene and that she told the paramedics to help the victim. After the victim was transported to the hospital, she told the police he was hit by a car because she was scared of what she had done. She did not speak to the officers again, and she was arrested that day. She consented to a search of her home after the police threatened not to release her children to her family. She identified photographs of injuries to her mouth from the victim's hitting her and to her elbow from falling to the floor after the victim hit her. The Defendant stated that at the time she pulled out the gun, she thought of all the times the victim hit and hurt her, the embarrassment she felt from other people witnessing the abuse, and the anger she felt from the victim's calling her son stupid and hitting her son with an extension cord. She said that she was hurt, angry, and humiliated and that the same things occurred repeatedly with the victim. She said that she "saw stars" and "was seeing red" and that she was not thinking clearly and did not intend to kill the victim.

On cross-examination, the Defendant testified that her relationship with the victim lasted six years. When questioned about the lack of police reports relative to previous incidents of domestic assault, the Defendant stated that the victim "jumped on" her when she was pregnant and that she told the police the victim had an open warrant for domestic violence for jumping on a previous girlfriend. She agreed she did not call the police on the day of the shooting after the victim hit her and said she was too scared to call the police most of the time.

The Defendant testified that the house contained drugs and many guns at the time the police searched it. The gun she used was kept in the bedroom, and she knew it was loaded. She agreed her younger son was inside the house when the victim struck her and said afterward she was not thinking clearly when she obtained the gun from the bedroom. She admitted she did not know what her son was doing at that time. She denied, though, wanting to kill the victim. She recalled placing the gun inside her pants. She agreed the victim was not inside the house when she obtained the gun but said she was always in

fear of the victim and did not know if he was still nearby. She agreed she walked outside with the gun and followed the victim down the street. She denied telling Mr. Jones to get out of the way. Although she agreed the gun misfired once, she denied thinking about killing the victim. She said that she felt as though she experienced déjà vu because the victim hit her three weeks before the shooting. She discussed the cycle of violence, including the victim's apologizing and making promises, which were ultimately always broken. She said she had endured enough.

The Defendant testified that she and the victim did not argue about the victim's dating other women. She denied she looked through the victim's cell phone and said, "You don't touch [the victim's] phone." She said Ms. Stewart was in the kitchen when the victim struck her, and Mr. Jones was outside the house. She said that as she walked behind the victim and Mr. Jones, she cried and yelled at the victim. She admitted she placed the gun in the toilet tank to hide it.

Memphis Police Sergeant Thomas Mote testified in rebuttal that he obtained and executed the search warrant at the Defendant and the victim's house. He said a pair of red underwear, a gun holster, a Smith & Wesson .22-caliber revolver, and a residential cordless telephone were seized during the search. He said no drugs or additional firearms were found. On cross-examination, he stated that he did not participate in the search but that he oversaw the operation. He agreed that it was possible the officers missed something and that the search warrant specified the police were looking for only one gun.

Memphis Police Sergeant Daniel Cordero testified that he spoke to Candice Ayers, the Defendant's sister, at the scene and that Ms. Ayers was upset and had been crying. He identified photographs of Ms. Ayers's cell phone, which showed an outgoing call to the Defendant at 11:21 a.m. and an incoming call from the Defendant at 1:05 p.m. on the day of the shooting.

Candice Ayers testified that she spoke with the Defendant twice on the day of the shooting. Ms. Ayers called the Defendant during Ms. Ayers's morning drive to work, and she received a call from the Defendant later that afternoon. During the first conversation, the Defendant discussed her children and her relationship with the victim. The Defendant was upset and told Ms. Ayers that she and the victim had argued the previous night and the morning of the shooting, although the Defendant did not state the subject of the argument.

Ms. Ayers said the Defendant admitted during their second conversation that she shot the victim.

On cross-examination, Ms. Ayers testified that during the first conversation, the Defendant did not mention any violence from the victim. She said that during the second conversation, the Defendant mentioned the physical altercation with the victim.

*Ayers I*, 2015 WL 4366633, at \*1-9.

In its order granting the State's application for review pursuant to Tennessee Rule of Appellate Procedure 11, the supreme court stated that the case was remanded to this court "in light of this Court's opinion in *State of Tennessee v. Willie Duncan*, which opinion was released at Jackson on October 14, 2016." *State v. Angela Ayers*, No. W2014-00781-SC-R11-CD (Tenn. Oct. 31, 2016) (order). We note that the Defendant was indicted for first degree murder, false report, and employing a firearm during the commission of a dangerous felony without identifying an enumerated felony from Tennessee Code Section 39-17-1324(i)(1) (2010) (amended 2012). The *Willie Duncan* decision is relevant to the employing a firearm during the commission of a dangerous felony conviction, and we limit our consideration in this remand accordingly.

At the time *Ayers I* was filed, our supreme court had granted the State's application for permission to appeal pursuant to Tennessee Rule of Appellate Procedure 11 in *Willie Duncan* but had not yet released its opinion. *See State v. Willie Duncan*, No. W2013-02554-SC-R11-CD (Tenn. Feb. 3, 2015) (order). In *Willie Duncan*, the five-count indictment charged the Defendant, in relevant part, with employing a firearm during the commission of a dangerous felony without specifying in the indictment the dangerous felony upon which the State intended to rely at the trial. Likewise, the indictment charged aggravated burglary and especially aggravated kidnapping, both of which were enumerated dangerous felonies. *Willie Duncan*, --- S.W.3d at ---, 2016 WL 6024007, at \*1-2. The relevant issues framed by the court were "whether the indictment on the firearm charge must designate the predicate dangerous felony in order to comport with the constitutional right of an accused to be informed of the nature and cause of the accusation against him" and whether the defendant was provided adequate notice of the charge against him. *Id*. at \*8.

In determining that the indictment count in *Willie Duncan* charging employing a firearm during the commission of a dangerous felony was not defective by not specifying which of the independently charged offenses the State would rely upon for a conviction, aggravated burglary or especially aggravated kidnapping, the supreme court noted the following proposition:

It has long been settled that, to determine whether a single count in an indictment provides adequate notice to a defendant, the court may read that count together with other counts in the indictment. '[I]f it is reasonably clear from the averments . . . that [the other counts are] connected with and a part of the preceding count . . . such a count may be considered good.

*Id.* (citing *State v. Youngblood*, 287 S.W.2d 89, 91 (Tenn. 1956); *State v. Narrell Christopher Pierce*, No. M2014-00120-CCA-R3-CD, 2015 WL 2102003, at *15 (Tenn. Crim. App. May 5, 2015), *perm. app. denied* (Tenn. Aug. 13, 2015); *State v. Demeko Gerard Duckworth*, No. M2012-01234-CCA-R3-CD, 2013 WL 1933085, at *21 (Tenn. Crim. App. May 10, 2013), *perm. app. denied* (Tenn. Oct. 17, 2013)).

Relying on this proposition, the supreme court concluded in *Willie Duncan* that it was "reasonably clear" that the indictment count charging employing a firearm during the commission of a dangerous felony was "connected" to the separate indictment counts charging aggravated burglary and especially aggravated kidnapping because both offenses were enumerated dangerous felonies. *Willie Duncan*, --- S.W.3d at ---, 2016 WL 6024007, at *8. The court, likewise, concluded that the prosecution could establish that a defendant's employing a firearm occurred during the commission of a dangerous felony by "'alternative means,' that is, by proving either of the two possible" enumerated dangerous felonies also charged in the indictment. *Id.* at *9 (citing *State v. Hammonds*, 30 S.W.3d 294, 301 (Tenn. 2000)). As a result, the court concluded, based upon the indictment as a whole, that the defendant was "sufficiently apprised . . . of the nature and cause of the accusation against him and [that the indictment] enabled him to adequately prepare a defense to" the employing a firearm during the commission of a dangerous felony charge. *Willie Duncan*, --- S.W.3d at ---, 2016 WL 6024007, at *9; *see State v. Rhakim Martin*, --- S.W.3d ---, ---, No. W2013-02013-SC-R11-CD, 2016 WL 6024009, at *11 (Tenn. Oct. 14, 2016).

In this court's previous opinion, we determined that the indictment count charging employing a firearm during the commission of a dangerous felony was defective because the count did not enumerate which dangerous felony the prosecution would rely upon at the trial and because the remaining indictment counts did not allege the Defendant committed an enumerated dangerous felony. *Ayers I*, 2015 WL 4366633, at *15. In addition to the firearm charge, which did not identify an enumerated felony, the Defendant was charged with first degree murder and false report, and neither offense was a dangerous felony at the time offenses were committed. *See* T.C.A. § 39-17-1324(i)(1)(A)-(M). The supreme court's focus in *Willie Duncan* was whether the offenses charged in the indictment provided the defendant sufficient notice to determine which of the separately charged offenses would satisfy the dangerous felony element relative to the employing a firearm charge. In the present case, the indictment did not provide sufficient notice because the State did not indict

the Defendant, independent of the employing a firearm charge, for any enumerated dangerous felony.

We reject the State's argument that the Defendant was provided sufficient notice of the underlying dangerous felony because voluntary manslaughter was the only lesser included offense of first degree murder that was a dangerous felony at the time of the offense. The issue in this appeal is framed in the context of sufficiency of the indictment for employing a firearm during the commission of a dangerous felony, not sufficiency of the evidence. In the context of sufficiency of an indictment, the appellate courts are not permitted to examine the evidence at the "trial to determine which felonies may be disqualified under section [39-17-]1324(c)." *Willie Duncan*, --- S.W.3d at ---, 2016 WL 6024007, at *6. Appellate courts are, however, permitted to read the employing a firearm indictment count together with the remaining counts. *See Youngblood*, 287 S.W.2d at 91; *Willie Duncan*, --- S.W.3d at ---, 2016 WL 6024007, at *8.

Because the indictment count charging employing a firearm during the commission of a dangerous felony did not specify upon which dangerous felony the State would rely for a conviction, we must examine the remaining counts in the indictment to determine whether the Defendant received adequate notice of the charge against her. A reading of the indictment as a whole reflects that neither of the remaining charges in the indictment, first degree murder and false report, could have provided the Defendant adequate notice of the dangerous felony upon which the State would rely to obtain a conviction for the firearm charge because neither of the charges were enumerated felonies.

*State v. Shawn Thompson*, No. M2013-01274-CCA-R3-CD, 2014 WL 2609535, at *5 (Tenn. Crim. App. June 11, 2014), is instructive. The defendant in *Shawn Thompson* was indicted, in relevant part, for attempt to commit first degree murder for an incident occurring in June 2010, at which time attempted first degree murder was an enumerated dangerous felony. *See* T.C.A. § 39-17-1324(i)(1)(A) (Supp. 2009) (amended 2012). The indictment specified that the underlying dangerous felony relative to a violation of Code section 39-17-1324 was attempted first degree murder. The jury, however, convicted the defendant of the lesser included offense of attempted voluntary manslaughter, which was also an enumerated dangerous felony. *See id.* § 39-17-1324(i)(1)(C), (M). This court concluded that no variance existed between the indictment charging attempted first degree murder and the proof at trial resulting in a conviction for attempted voluntary manslaughter because "[a]ttempted voluntary manslaughter is a lesser-included offense of attempted first degree murder." *Shawn Thompson*, 2014 WL 2609535, at *6.

Likewise, in *State v. Antoine Perrier*, No. W2011-02327-CCA-MR3-CD, 2013 WL 1189475, at *10 (Tenn. Crim. App. Mar. 22, 2013), *perm. app. dismissed* (Tenn. Feb. 7, 2014), this court upheld convictions for employing a firearm during the commission of a dangerous felony and attempted voluntary manslaughter, a lesser included offense of the indicted offense attempted second degree murder. At the time of the offenses, attempted second degree murder and attempted voluntary manslaughter were enumerated dangerous felonies. In *State v. Andrianne Kiser*, No. W2011-01937-CCA-R3-CD, 2012 WL 6115087 (Tenn. Crim. App. Dec. 10, 2012), *perm. app. denied* (Tenn. May 7, 2013), this court also upheld convictions for employing a firearm during the commission of a dangerous felony and attempted voluntary manslaughter, a lesser included offense of the indicted offense of attempted second degree murder. At the time of the offenses, attempted second degree murder and attempted voluntary manslaughter were enumerated dangerous felonies.

The critical distinction between *Shawn Thompson*, *Antoine Perrier*, and *Andrianne Kiser* and the present case is that both the indicted offenses and the lesser included offenses of which the defendants were convicted were enumerated dangerous felonies. In the present case, the Defendant was not indicted separately for an enumerated dangerous felony connected to the firearm charge. *See Willie Duncan*, --- S.W.3d at ---, 2016 WL 6024007, at *8. We note that Tennessee Code Annotated section 39-17-1324(d) states that employing a firearm is a "specific and separate offense, which shall be pled in a separate count of the indictment . . . and *tried before the same jury and at the same time as the dangerous felony*." (emphasis added). In lieu of identifying the enumerated dangerous felony in the indictment count charging employing a firearm during the commission of a dangerous felony, a reading of the statute, in conjunction with *Willie Duncan*, leads us to conclude that an indictment must charge a defendant with employing a firearm during the commission of a dangerous felony and with at least one enumerated dangerous felony. *See Rhakim Martin*, --- S.W.3d at ---, 2016 WL 6024009, at *11 (A two-count indictment charging carjacking, an enumerated dangerous felony at the time of the offenses, and employing a firearm during the commission of a dangerous felony provides sufficient notice to the defendant relative to the firearm charge); *see also Willie Duncan*, --- S.W.3d at ---, 2016 WL 6024007, at *9 (A multi-count indictment charging two enumerated dangerous felonies and employing a firearm during the commission of a dangerous felony provides sufficient notice to the defendant relative to the firearm charge.).

Upon reconsideration and in view of *Willie Duncan*, we conclude that the indictment count charging the Defendant with employing a firearm during the commission of a dangerous felony provided inadequate notice of the crime charged. Although the State's failure to identify the enumerated dangerous felony in the firearm charge did not render the indictment defective pursuant to *Willie Duncan*, the failure to indict the Defendant separately for an enumerated dangerous felony failed to provide adequate notice of which enumerated

dangerous felony the State would rely upon at the trial.  The employing a firearm statute contains multiple enumerated dangerous felonies, and the indictment as a whole contained no additional information relative to which dangerous felony the State would rely upon at the trial.  We reiterate that "[a]llowing the State to indict a defendant for a non-enumerated dangerous felony offense and to rely on that offense as a basis for obtaining a conviction for a violation of Code section 39-17-1324 in the event a jury convicts a defendant of an applicable lesser included offense deprives a defendant of adequate notice of the alleged offense." *Ayers I*, 2015 WL 4366633, at \*15.  As a result, we reverse the Defendant's conviction for employing a firearm during the commission of a dangerous felony, vacate the conviction, and dismiss the charge.

In consideration of the foregoing and the record as a whole, we reverse the judgment for employing a firearm during the commission of a dangerous felony, vacate the conviction, and dismiss the charge.  Our analyses of the remaining issues raised in this appeal are unaffected by *Willie Duncan* and remain as stated in this court's previous opinion.  The judgments for voluntary manslaughter and false report are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE